# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JULIE BUSH, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MANSUETO VENTURES LLC, a Delaware limited liability company,<br><br>Defendant. | Case No.: 2:15-cv-13716<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Julie Bush brings this Class Action Complaint and Demand for Jury Trial ("Complaint") against Defendant Mansueto Ventures LLC to obtain redress for all persons injured by its intentional and unlawful disclosure of Plaintiff's and a proposed Class of consumers' sensitive and statutorily protected information. Plaintiff, for her Complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys:

## NATURE OF THE CASE

1.      Mansueto is an American media company that publishes the *Inc.* and *Fast Company* magazines.

2.      Unfortunately for its subscribers, Mansueto supplements its sales and advertising revenues by secretly selling their statutorily protected information—

including their full names, titles of magazines subscribed to, and home addresses (collectively "Personal Reading Information")—to data miners and other unrelated third party companies. Mansueto also trades its subscribers' Personal Reading Information with other data miners and aggregators for the purpose of "appending" (*i.e.*, supplementing) its customer files with other highly sensitive data about them, such as their age, income level, purchasing habits, and other lifestyle information. By enhancing its customers' Personal Reading Information in this way, Mansueto is able to increase the "street value" of its customer lists and sell or trade them at a higher premium.

3.     In order to facilitate its surreptitious multi-million dollar disclosure business, Mansueto hides its practices from its subscribers, and neither notifies them nor obtains their permission before disclosing their Personal Reading Information to unrelated third parties.

4.     Mansueto's disclosure practices squarely violate Michigan's Preservation of Personal Privacy Act, M.C.L. §§ 445.1711–15—a broad consumer protection statute popularly referred to as the Video Rental Privacy Act ("VRPA"). The VRPA prohibits companies like Mansueto from disclosing—without written permission—any information that specifically identifies a person as having purchased written materials, such as magazines.

5.     Accordingly, Plaintiff Bush brings this Complaint against Mansueto

for its intentional and unlawful disclosure of its subscribers' Personal Reading

Information in violation of the VRPA, as well as for its unjust enrichment from

such practices.

## PARTIES

6.      Plaintiff Julie Bush is a natural person and citizen of the State of

Michigan.

7.      Defendant Mansueto Ventures LLC is a Delaware limited liability

company with its principal place of business located at 7 World Trade Center, New

York, New York 10007. Mansueto is also registered to conduct business in the

State of Michigan (as Michigan Department of Licensing and Regulatory Affairs

ID Number B9474P). Mansueto conducts business throughout this District, the

State of Michigan, and the United States.

## JURISDICTION AND VENUE

8.      This Court has personal jurisdiction over Mansueto because it is

registered to, and regularly does, conduct business in Michigan, including by

soliciting business from, and entering into transactions with, Michigan consumers.

Further, the unlawful conduct alleged in the Complaint occurred in, was directed

at, and/or emanated from this District.

9.      This Court has subject matter jurisdiction over this action pursuant to

28 U.S.C. § 1332(d) because at least one Class member is a citizen of a State

different than Defendant, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and none of the exceptions under that subsection apply to this action.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claim occurred in this District. Venue is additionally proper because Plaintiff Bush resides within this District and Defendant conducts significant business in this District, including soliciting consumer business and entering into consumer transactions here.

## FACTUAL BACKGROUND

### I.     An Overview of the VRPA.

11.     In 1988, after the public disclosure of then-Supreme Court nominee Robert Bork's (and his family's) video viewing records, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and written materials offer "a window into [their] loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599, at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

12.     Congress responded by passing the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA")—which, as enacted, regulates a certain type of

4

business (a "video tape service provider") and a narrow subset of consumer information (that is, "information which identifies a person as having requested or obtained specific video materials or services"). Although this statute initially also sought to "protect[] the selection of books that [consumers] read," 134 Cong. Rec. S5399 (May 10, 1988), the final version of the VPPA was limited to video materials. *See* 18 U.S.C. § 2710.

13.     The Michigan Legislature, however, decided that the federal VPPA didn't go far enough, and expressed concern that Michigan consumers' "choice[s] in reading, music, and video entertainment [were] a private matter, and not fit for consideration by gossipy publications, employers, clubs, or anyone else." H.B. No. 5331 (Jan. 20, 1989).

14.     As a result, in 1989, the VRPA was enacted "to preserve personal privacy with respect to the purchase, rental, or borrowing of certain materials[,]" including written materials such as books and magazines. M.C.L. Ch. 445. The VRPA therefore provides, in relevant part, that:

> a person, or an employee or agent of the person, engaged in the business selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings shall not disclose to any person, other than the customer, a record or information concerning the purchase lease, rental, or borrowing of those materials by a customer that indicates the identity of the customer.

M.C.L. § 445.1712.

15.     As such, and in comparison to its more limited federal analogue, the Michigan VRPA expressly regulates a broader set of businesses (those engaged in, among other things, "the business of selling at retail . . . written materials") and protects a wider array of consumer information (*i.e.*, any "record or information concerning the purchase, rental, or borrowing of those materials by a customer that indicates the identity of the customer"). *Compare* 18 U.S.C. § 2710 *with* M.C.L. § 445.1712.

## II.    Consumers' Personal Information Has Real Value.

16.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . and individuals are concerned about being defined by the existing data on themselves."[1]

17.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[2]

---

[1]     *The Information Marketplace: Merging and Exchanging Consumer Data*, Federal Trade Commission, 8, 11 (Mar. 13, 2001), *available at* http://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last accessed Oct. 13, 2015).

[2]     *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*,

18.     The FTC has also recognized that consumer data possesses inherent

monetary value within the new information marketplace, and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of
> information collected by businesses, or why their information may be
> commercially valuable. *Data is currency. The larger the data set, the
> greater potential for analysis—and profit.*[3]

19.     In fact, an entire industry exists where companies known as data

miners purchase, trade, and otherwise collect massive databases of information

about consumers. Data miners then profit by selling this "extraordinarily intrusive"

information in an open and largely unregulated market.[4]

20.     The scope of data miners' knowledge of consumers' private

information is immense: "If you are an American adult, the odds are that [they]

know[] things like your age, race, sex, weight, height, marital status, education

level, politics, buying habits, household health worries, vacation dreams—and on

---

WSJ.com (Feb. 28, 2011),
http://online.wsj.com/article/SB10001424052748703529004576160764037920274
.html (last visited Oct. 13, 2015).

[3]      Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable*,
Federal Trade Commission, 2 (Dec. 7, 2009), *available at*
http://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-
exploring-privacy-roundtable/091207privacyroundtable.pdf (last accessed Oct. 13,
2015) (emphasis added).

[4]      *See* Martha C. White, *Big Data Knows What You're Doing Right Now*,
TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-
knows-what-youre-doing-right-now/ (last visited Oct. 13, 2015).

and on."[5]

21.     Recognizing the serious threat the data mining industry poses to

consumers' privacy, the Co-Chairmen of the Congressional Bi-Partisan Privacy

Caucus sent letters to nine major data brokerage companies seeking information on

how those companies compile, store, and sell their massive collections of

consumer data.[6] In their letters, the Co-Chairmen recognized that:

> [t]he business of data brokerage, namely the collecting, assembling,
> maintaining, and selling to third-parties of consumers' personal
> information, has grown into a multiple billion dollar industry. *By
> combining data from numerous offline and online sources, data
> brokers have developed hidden dossiers on almost every U.S.
> consumer.* This large[-]scale aggregation of the personal information
> of hundreds of millions of American citizens raises a number of
> serious privacy concerns.[7]

22.     Unfortunately, magazine publishers like Mansueto commonly engage

---

[5]     Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, The New York Times (June 16, 2012), http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited Oct. 13, 2015).

[6]     *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Senator Ed Markey, http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited Oct. 13, 2015).

[7]     *See*, *e.g.*, Letter from Edward J. Markey and Joe Barton, Co-Chairmen, Congressional Bi-Partisan Privacy Caucus, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 2, 2012), *available at* http://markey.house.gov/sites/markey.house.gov/files/documents/Axciom%20letter.pdf) (last accessed Oct. 13, 2015) (emphasis added).

in these practices by participating in "database cooperatives," where publishers can engage in the *quid pro quo* swapping of access to their respective customer lists that, by its nature, involves the disclosure of customers' Personal Reading Information.

23.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

## III.  Mansueto Unlawfully Discloses its Subscribers' Personal Reading Information.

24.     Mansueto maintains a vast digital database comprised of its subscribers' Personal Reading Information.

25.     Without seeking permission to do so, Mansueto discloses this information to data mining companies who then supplement it with additional sensitive personal information about each subscriber—such as their age, income level, purchasing habits, and other lifestyle information.

26.     This, in turn, allows Mansueto to amass highly detailed customer lists—sorted by, among other things, its subscribers' specific reading habits (*i.e.*, the specific magazines they've purchased and subscribed to) and demographic details (including the sensitive information Mansueto has obtained from data miners, such as, for example, a subscriber's age, ethnicity, gender, income,

political party affiliation, religion, and even the age of the subscriber's children)—which it can then sell and otherwise disclose at a higher premium to interested third parties.

27.    Unfortunately, Mansueto actively conceals these invasive data disclosure practices from its subscribers. In fact, regardless of how consumers purchase subscriptions to its publications, they are never presented with Mansueto's terms of service, privacy policy, or information-sharing policy. Consequently, Mansueto uniformly fails to obtain any form of consent from—or even provide effective notice to—its subscribers before disclosing their Personal Reading Information to third parties.

28.    By and through these actions, Mansueto not only disregards its subscribers' privacy, it also violates the VRPA.

## FACTS RELATING TO JULIE BUSH

29.    Plaintiff Julie Bush is a citizen of the State of Michigan.

30.    Bush purchased a subscription to *Inc.* from Mansueto in or around December 2014.

31.    *Inc.* is a magazine published, owned, and operated by Mansueto.

32.    Bush has never agreed in writing or otherwise to allow Mansueto to sell or disclose her Personal Reading Information to any unrelated third parties.

33.    Bush did not receive notice of such disclosures before Mansueto

disclosed her Personal Reading Information to unrelated third parties.

34.     Mansueto has disclosed, and continues to disclose, Bush's Personal Reading Information (*i.e.*, information that identifies Bush as having purchased a subscription to *Inc.*)—without obtaining her permission or providing prior notice—to data mining companies, who append the information with data from their own records.

35.     During this same time period, Mansueto has also disclosed—and continues to disclose—Bush's Personal Reading Information to other unrelated third party companies, including so-called "database cooperatives" without first obtaining her consent or giving her prior notice of the disclosures.

36.     These disclosures to unrelated third party companies squarely violate the VRPA.

37.     Further, and even though it lacked permission to even disclose her Personal Reading Information in the first place, Mansueto profited from its disclosures of Bush's Personal Reading Information.

38.     Ultimately, what Bush received (a subscription without privacy protections) was substantially less valuable than what she paid for (a subscription with accompanying privacy protections). Had she known that Mansueto would disclose her Personal Reading Information to third parties without her permission, Bush would not have purchased her subscription. Thus, Bush has suffered concrete

economic harm in the form of the monies paid to Mansueto in exchange for the magazine subscription.

## CLASS ACTION ALLEGATIONS

39.    **Class Definition**: Plaintiff Bush brings this action on behalf of herself and a proposed Class, defined as follows:

> All Michigan residents who purchased subscriptions to a Monsueto magazine.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

40.    **Numerosity**: The exact number of Class members is unknown to Plaintiff at this time, but it is clear that individual joinder of each Class member is impracticable. Defendant has disclosed the Personal Reading Information of thousands of consumers who fall into the definition of the Class. Ultimately, members of the Class will be easily identified through Defendant's records.

41.    **Commonality and Predominance**: Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting only individual members. Those questions with respect to the Class include, but are not limited to:

(a)    Whether Mansueto is "engaged in the business of selling at retail" books or other written materials (*i.e.*, magazines);

(b)    Whether Mansueto obtained written permission before disclosing Plaintiff's and the Class's Personal Reading Information to third parties;

(c)    Whether Mansueto's disclosure of Plaintiff's and the Class's Personal Reading Information violated the VRPA; and

(d)    Whether Mansueto was unjustly enriched through its conduct described herein.

42.    **Typicality**: Plaintiff's claims are typical of the claims of the other Class members. Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Personal Reading Information.

43.    **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class members, and have the financial resources to do so.

Neither Plaintiff nor her counsel have any interest adverse to those of the other Class members.

44.    **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's practices challenged herein apply to and affect the Class members uniformly, and Plaintiff's challenge of those practices hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

45.    **Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all Class members is impracticable. The damages suffered by the individual Class members will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the Class members to obtain effective relief from Defendant's misconduct on an individual basis. Even if Class members could sustain individual litigation, it would not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the

complex legal and factual controversies presented in this Complaint. By contrast, a

class action presents far fewer management difficulties and provides the benefits of

single adjudication, economy of scale, and comprehensive supervision by a single

court. Economies of time, effort, and expense will be fostered and uniformity of

decisions will be ensured.

46.    Plaintiff reserves the right to revise the definition of the Class as

necessary based upon information learned in discovery.

**FIRST CAUSE OF ACTION**
**Violation of M.C.L. § 445.1712**
**(On Behalf of Plaintiff and the Class)**

47.    Plaintiff incorporates the foregoing allegations as if fully set forth

herein.

48.    As a magazine publisher that sells subscriptions directly to consumers,

Mansueto is engaged in the business of selling written materials at retail. *See*

M.C.L. § 445.1712.

49.    By purchasing a subscription to *Inc.* from Mansueto, Bush purchased

written materials at retail from Mansueto. *See* M.C.L. § 445.1712.

50.    Because Bush purchased written materials at retail from Mansueto,

she is a "customer" within the meaning of the VRPA. *See* M.C.L. § 445.1711(a).

51.    At all times relevant, and beginning when Bush first subscribed to

*Inc.*, Mansueto disclosed—and continues to disclose—her Personal Reading

15

Information, which identifies her as a *Inc*. subscriber, in at least two ways.

52.     First, Mansueto disclosed customer lists containing Bush's Personal Reading Information to data mining companies who then supplemented the lists with additional sensitive information from their own databases.

53.     Second, Mansueto disclosed customer lists containing Bush's Personal Reading Information to other third party companies that, in turn, sold and/or disclosed those lists (or access to those lists) to a number of other parties— including other magazine publishers.

54.     By disclosing its customer lists, Mansueto disclosed to persons other than Plaintiff, records or information concerning her purchase of written materials from Mansueto. *See* M.C.L. § 445.1712.

55.     The information disclosed by Mansueto communicates Bush's name and address, as well as the fact that she subscribes to *Inc*. Accordingly, the records or information disclosed by Mansueto indicates Bush's identity. *See* M.C.L. § 445.1712.

56.     Bush never provided Mansueto with consent to disclose her Personal Reading Information to anyone—in writing or otherwise.

57.     Worse still, Bush did not receive any prior notice of Mansueto's disclosures of her Personal Reading Information to third parties.

58.     On information and belief, Mansueto's disclosures of Bush's Personal

Reading Information were not made pursuant to a court order, search warrant, or grand jury subpoena.

59.     Mansueto's disclosures of Bush's Personal Reading Information were not made to collect payment for her subscriptions.

60.     Mansueto's disclosures of Bush's Personal Reading information were made to third parties, including data miners and database cooperatives, in order to increase Mansueto's revenue and ability to prospectively market its own products—*i.e.*, subscriptions to *Inc.* and *Fast Company*—to the subscribers of *other* publications (among other reasons). Accordingly, Mansueto's disclosures were not made for the exclusive purpose of marketing goods and services directly to Bush.

61.     By disclosing Bush's Personal Reading Information, Mansueto violated Bush's common law right to privacy.

62.     By disclosing Bush's Personal Reading Information, Mansueto violated Bush's statutorily protected right to privacy in her reading habits. *See* M.C.L. § 445.1712.

63.     Further, because Bush paid money to Mansueto for her *Inc.* subscription, and Mansueto was obligated to comply with the VRPA, Mansueto's unlawful disclosure of Bush's Personal Reading Information deprived her of the full value of her paid-for subscription. As such, and also because Bush ascribes

17

monetary value to the privacy of her Personal Reading Information, Mansueto's
unlawful disclosure of her Personal Reading Information caused her to receive less
value than she paid for, thereby causing her economic harm.

64.     Likewise, because Bush and the other Class members ascribe
monetary value to the privacy of their Personal Reading Information, a magazine
subscription that keeps their Personal Reading Information private pursuant to the
VRPA is more valuable than one that does not.

65.     Accordingly, had Bush known of Mansueto's surreptitious disclosure
practices at or before the time of her purchase, she would not have purchased her
*Inc.* magazine subscription. Thus, Mansueto's unlawful disclosures caused Bush
economic harm in the form of the purchase price of the magazine subscription.

66.     As described herein, Mansueto generates substantial revenue by
disclosing Plaintiff's and the Class's Personal Reading Information to data miners
and other unrelated third parties.

67.     As a result of Mansueto's unlawful and continued disclosure of their
Personal Reading Information, Plaintiff and the other Class members have suffered
privacy and economic injuries. Accordingly, on behalf of herself and the Class,
Plaintiff seeks: (1) an injunction prohibiting Mansueto from disclosing Plaintiff's
and the Class's Personal Reading Information without first obtaining their written
permission (*i.e.*, as required by the VRPA); (2) actual damages or $5,000.00,

18

whichever is greater, per Class member pursuant to M.C.L. § 445.1715(a); and (3)

costs and reasonable attorneys' fees pursuant to M.C.L. § 445.1715(b).

### SECOND CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class)

68.     Plaintiff incorporates the foregoing allegations as if fully set forth

herein.

69.     Bush and the Class members conferred a benefit on Mansueto by

providing Mansueto with their Personal Reading Information and paying Mansueto

for their magazine subscriptions. Mansueto received and retained the information

and money belonging to Bush and the Class when Plaintiff and the Class purchased

their subscriptions to Mansueto's publications.

70.     Because Mansueto received and processed Bush's and the Class's

subscription payments and Personal Reading Information, and because Mansueto

processes and fulfills the subscriptions and discloses Bush's and the Class's

Personal Reading Information to third parties, Mansueto appreciates and/or has

knowledge of such benefits.

71.     Under the VRPA, Bush and the Class members were entitled to

confidentiality in their Personal Reading Information as part of their subscriptions.

72.     Under principles of equity and good conscience, Mansueto should not

be allowed to retain the full amount of money Bush and the Class paid for their

subscriptions, or the money it received by disclosing Bush's and the Class's Personal Reading Information because Mansueto failed to comply with the VRPA.

73.     Bush and the other Class members have suffered actual damages as a result of Mansueto's unlawful conduct in the form of the monies paid for their magazine subscriptions, which they wouldn't have purchased had they known of Mansueto's unlawful disclosure practices.

74.     To prevent inequity, Mansueto should return to Bush and the Class all monies that they paid for their magazine subscriptions, and disgorge any profits derived from the disclosures at issue.

75.     Accordingly, on behalf of herself and the Class, Plaintiff seeks an order declaring that Mansueto's conduct constitutes unjust enrichment, and awarding Plaintiff and the Class restitution in an amount equal to that which they paid to Mansueto for their magazine subscriptions, as well as disgorgement of all profits derived by Mansueto as a result of its unlawful disclosures of Bush's and the Class's Personal Reading Information.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Julie Bush, on behalf of herself and the Class, prays that the Court enter judgment in her favor and against Mansueto, and for the following relief:

(1)     Certify the Class as defined above, appoint Plaintiff as Class

20

Representative, and designate her counsel as Class Counsel;

(2)     Declare that Mansueto's conduct as described herein is unlawful and violates the VRPA;

(3)     Declare that Mansueto's conduct as described herein constitutes unjust enrichment;

(4)     Award actual damages, including disgorgement, or $5,000.00, whichever is greater, to each Class member, as provided by the VRPA;

(5)     Award injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Mansueto to cease the unlawful disclosures discussed herein;

(6)     Award reasonable attorneys' fees and costs pursuant to M.C.L. § 445.1715(b); and

(7)     Such other and further relief as the Court deems equitable and just.

## DEMAND FOR TRIAL BY JURY

Plaintiff requests trial by jury of all claims that can be so tried.

//

//

//

Respectfully submitted,

**JULIE BUSH**, individually and on behalf of all others similarly situated,

Dated: October 20, 2015

By: /s/ Ari J. Scharg
      One of Plaintiff's Attorneys

Ari J. Scharg
ascharg@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Henry M. Scharg (P28804)
hmsattyatlaw@aol.com
LAW OFFICE OF HENRY M. SCHARG
718 Ford Building
Detroit, Michigan 48226
Tel: 248.596.1111
Fax: 248.496.1578

*Counsel for Plaintiff and the Proposed Class*